UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID RAYMOND WEJRANDT,

                Plaintiff,          Civil Action No. 16-10018
                                       Honorable Nancy G. Edmunds
                                       Magistrate Judge David R. Grand

v.

UNITED STATES ATTORNEY GENERAL and
COMMISSIONER OF SOCIAL SECURITY,

                Defendants.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [15, 16]**

        Plaintiff David Raymond Wejrandt ("Wejrandt") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [15, 16], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.     RECOMMENDATION**

        For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Wejrandt is not disabled under the Act. Accordingly, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [16] be GRANTED, Wejrandt's Motion for Summary Judgment [15] be DENIED, and that pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

## II.     REPORT

### A.     Procedural History

On September 19, 2012, Wejrandt filed an application for DIB, alleging a disability onset date of December 23, 2009.  (Tr. 30, 61, 112).  This application was denied at the initial level. (Tr. 68).  Wejrandt filed a timely request for an administrative hearing, which was held on May 12, 2014, before ALJ Gregory Holiday.  (Tr. 26-59).  Wejrandt, who was represented by attorney Michael Korby, testified at the hearing, as did vocational expert ("VE") Elizabeth Pasikowski. (*Id.*).  On July 7, 2014, the ALJ issued a written decision finding that Wejrandt is not disabled under the Act.  (Tr. 7-20).  On October 30, 2015, the Appeals Council denied review.  (Tr. 1-5). Wejrandt timely filed for judicial review of the final decision on January 4, 2016.  (Doc. #1).  On October 13, 2016, Wejrandt filed a Motion for Summary Judgment.  (Doc. #15).  The Commissioner filed a Motion for Summary Judgment on October 27, 2016 (Doc. #16), and Wejrandt filed a reply on November 28, 2016.  (Doc. #17).

### B.     Framework for Disability Determinations

Under the Act, DIB benefits are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or

mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C.    Background

#### 1.    Wejrandt's Reports and Testimony

At the time of the administrative hearing, Wejrandt was 54 years old, and at 5'7'' tall, weighed 255 pounds (down from 280). (Tr. 30, 128, 132). He lived in a two-story townhouse with his wife and twenty-two-year-old daughter.[1] (Tr. 39-40). Wejrandt completed three years of college and worked as an insurance claims adjuster between 1994 and December 23, 2009, when he was laid off due to "cutbacks." (Tr. 30-31, 133, 139-41). He estimated that he spent sixty to sixty-five percent of the day sitting and the rest of the day standing, walking, kneeling,

---

[1] When Wejrandt filed his DIB application, he lived in a house with friends, where he cooked for himself and did laundry. (Tr. 36-38, 147).

and crouching.  (Tr. 48, 140-41).  He lifted ten pounds frequently and up to 100 pounds.  (*Id.*).

When he stopped working as a claims adjuster, he was having issues with his back and his right

leg.  (Tr. 31).  He then had a few temporary jobs that each lasted just one day due to the issues

with his back and leg.  (*Id.*).  Wejrandt testified that he would not be able to do his previous job

as a claims adjuster because of its physical demands.  (Tr. 52).

In February or March of 2010, Wejrandt applied for and received unemployment

benefits.  (Tr. 32-33).  He applied then, rather than sooner, because he had been looking for jobs

and believed he would be successful in finding a suitable one.  (Tr. 33).  However, he found that

"nobody seemed to be hiring."  (*Id.*).  Wejrandt received unemployment for almost two full years

and was looking for work the entire time, "trying to get close" to the salary he had been earning

at the insurance company.  (Tr. 34-35).  He received interviews, but believes he was not hired

because younger workers could be paid less.  (*Id.*).

Wejrandt alleges disability as a result of various physical conditions, including a heart

condition, diabetes, a back condition, and hypertension.  (Tr. 132).  His congestive heart failure

makes it hard to go up stairs.  (Tr. 147).  His diabetes has given him neuropathy in his feet,

which makes it hard to walk and go down stairs.  (Tr. 147, 152).  Neuropathy causes random

shooting pains and cramping that interrupt his sleep.  (Tr. 148).  The herniated discs in his lower

back pinch his sciatic nerve and make it "difficult to walk any distance."  (Tr. 147).  His

neuropathy and back condition limit his ability to lift, squat, and stand.  (Tr. 152).  He is starting

to have neuropathy in his fingertips, which affects his ability to button shirts and type.  (Tr. 52).

He uses a non-medically-prescribed cane "as needed."  (Tr. 44, 153).

Wejrandt indicated in his Function Report and in his Disability Report that he takes the

following medications:  Metformin (for diabetes), Spironolactone (for hypertension), Furosemide

(for hypertension), and Vicodin (for pain).  (Tr. 154, 159).  The side effects include headaches, dizziness, drowsiness, and muscle pain.  (*Id.*).  During the hearing, he added that he takes Tramadol instead of Vicodin, "which seems to help take the edge off" his pain.  (Tr. 46).  His conditions do not affect his ability to pay attention or follow instructions.  (Tr. 152).  He handles stress "pretty well" and is "very flexible" with changes in routine.  (Tr. 153).

Wejrandt can walk 100 to 200 yards (before having to rest), sit for half an hour, and stand for about seven or eight minutes.  (Tr. 44-45, 152).  It hurts his back both to stand and sit, and if he sits too long his feet feel like they are swelling and throbbing.  (Tr. 44-45, 48).  This discomfort escalates the longer he remains seated with his feet down.  (Tr. 48).  It is alleviated by either walking for five to fifteen minutes or by putting his feet up for forty-five minutes to an hour.  (Tr. 48-49).  Given his difficulty with standing and sitting, he usually sits in a recliner with his feet elevated.  (Tr. 45).  He has trouble going up stairs and uses a hand rail.  (Tr. 50).  He can lift twenty-five to thirty pounds.  (Tr. 51).  He goes outside every other day and can go out alone.  (Tr. 150).  He typically goes to his neighbor's house or to support meetings.  (Tr. 151).  While Wejrandt testified that he had not driven for about a year and a half because the numbness in his feet makes him lack confidence that he is hitting the right part of the pedal, in his Function Report, he indicated that he doesn't drive because he lost his license and can't afford to pay the fine to get it back.  (Tr. 51, 150).

Wejrandt takes care of his personal needs, including preparing his own meals.  (Tr. 148-49).  He goes grocery shopping once every week or two for a couple of hours.  (Tr. 41-42, 150).  He does laundry in the basement, but keeps his clothes there so he doesn't have to bring them upstairs.  (Tr. 39-40, 50).  He vacuums for approximately ten minutes at a time.  (Tr. 41, 50).  He doesn't do yard work.  (*Id.*).  Wejrandt's hobbies include reading, watching television and

movies, talking with relatives, and playing card games.  (Tr. 42, 151).  He uses a computer.  (Tr. 42).  Although he indicated in his Function Report that he can no longer ride a bicycle, he testified during the hearing that he rides two or three miles on his bicycle, walks, and exercises with hand weights.  (Tr. 36, 151-52).  He does not have problems with social interactions and gets along with authority figures "pretty well."  (Tr. 151-53).

### 3.    Medical Evidence

The Court has thoroughly reviewed Wejrandt's medical record.  Rather than summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### 4.    Vocational Expert's Testimony

Elizabeth Pasikowski testified as an independent VE at the administrative hearing.  (Tr. 53-58).  The VE characterized Wejrandt's past relevant work as a claims adjuster as skilled in nature and light according to the Dictionary of Occupational Titles ("DOT").  (Tr. 54, 183).  The ALJ asked the VE to imagine a hypothetical individual of Wejrandt's age, education, and work experience that could perform light work with the following limitations:  sitting for four hours in an eight-hour workday; standing for four hours in an eight-hour workday; pushing and pulling with the upper extremities up to the exertional amounts; occasional climbing, stooping, crouching, kneeling, crawling; and frequent balancing.  (Tr. 54).  The VE testified that the hypothetical individual would be capable of performing the past relevant work.  (*Id.*).

The ALJ then asked the VE to imagine a hypothetical individual with the same limitations as in the previous example but who needs a job that would allow the person to alternate between sitting and standing up to four times per hour during the workday.  (Tr. 55).  In addition, the individual could not climb ropes or scaffolding.  (*Id.*).  The VE testified that this

person could not perform the past work of a claims adjuster but listed the following unskilled light jobs as potential options:  cashier (2,600 jobs in Michigan, 136,000 jobs in the national economy); assembler (4,600 jobs in Michigan, 188,000 jobs in the national economy); and packer (1,700 jobs in Michigan, 131,000 jobs in the national economy).  (*Id.*).

Next, the ALJ asked the VE to imagine an individual with the same restrictions as in the second hypothetical except that this person can't climb ladders, ropes, or scaffolding and can rarely (less than 5% of the workday) crawl or kneel.  (*Id.*).  The VE testified that this would not change the jobs that this person would be capable of performing.  (*Id.*).

In the following hypothetical, the ALJ asked the VE to imagine an individual with the same restrictions as in the third hypothetical but where the person could perform at the sedentary level of exertion.  (*Id.*).  The individual must also be able to alternate between sitting and standing at will; must avoid concentrated exposure to temperature extremes and environmental irritants like dust, gases, fumes, odors, and chemicals; and must avoid moderate exposure to high humidity and soldering fluxes.  (Tr. 56).  This person needs at least one unscheduled break per workday that lasts up to fifteen minutes; must be allowed to be off task up to 10% in a workday; and must be able to take health-related absences from work every month fairly consistently. (*Id.*).  The VE testified that there would be no unskilled jobs for an individual with this required level of absences.  (*Id.*).  The VE stated that this testimony is consistent with the DOT.  (*Id.*).

### D.     The ALJ's Findings

At Step One of the five-step sequential analysis, the ALJ found that Wejrandt did not engage in substantial gainful activity since December 23, 2009 (his alleged onset date).  (Tr. 12). Next, the ALJ found that Wejrandt has the severe impairments of atrial fibrillation, peripheral edema of the bilateral lower extremities, history of congestive heart failure, hypertension,

diabetes mellitus, obesity, cirrhosis of the liver, and degenerative disc disease of the lumbar spine.  (Tr. 13).  At Step Three, the ALJ found that Wejrandt's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 13-14).

The ALJ then found that Wejrandt retains the residual functional capacity ("RFC") to perform light work, with the following additional limitations:  he must be allowed to alternate between sitting and standing up to four times per hour; can only push or pull with the upper extremities up to the exertional amount; can frequently balance; can occasionally climb ramps or stairs and stoop or crouch; can rarely (up to 5% of the workday) kneel or crawl; and can never climb ladders, ropes, or scaffolds.  (Tr. 14-18).

At Step Four, the ALJ concluded that Wejrandt has no past relevant work.  (Tr. 19).  At Step Five, the ALJ found that considering Wejrandt's age, education, work experience, and RFC, he can perform the following jobs that exist in significant numbers in the national economy: cashier, assembler, and packer.  (Tr. 19-20).  As a result, the ALJ concluded that Wejrandt is not disabled under the Act.  (Tr. 20).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the

8

merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence

supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'").

### F.       Analysis

In his motion for summary judgment, Wejrandt argues that:  (1) the ALJ violated the "treating physician rule"; (2) the ALJ erred by providing an improper and incomplete RFC to the VE; and (3) the ALJ's credibility determination is not supported by substantial evidence.  These arguments are addressed below.

### 1.      The ALJ did not Violate the Treating Physician Rule

Wejrandt argues that the ALJ violated the treating physician rule by giving "little weight" to the medical source statements authored by Wejrandt's treating physician, Dr. Deborah Marietta Nunez, D.O., while "unjustifiably" giving "greater weight" to the opinion of State agency consultant, Stephen E. Wood, M.D.  (Doc. #15 at 2-3, 10).  Wejrandt believes that "virtually everything in the record" supports Dr. Nunez's opinion, so it should have been given greater weight because she was his treating physician.  (*Id.* at 10).  In addition, he argues that the ALJ failed to explain how Dr. Nunez's opinion is unsupported by the record or why the opinion of Dr. Wood, a non-treating physician, is supported by the record.  (*Id.* at 5, 10).

"Generally, the opinions of treating physicians are given substantial, if not controlling, deference," but they "are only given such deference when supported by objective medical evidence."  *Warner*, 375 F.3d at 390 (citing *King v. Heckler,* 742 F.2d 968, 973 (6th Cir. 1984) and 20 C.F.R. § 404.1527(d)(2)).  Thus, an ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'"  *Blakley*, 581 F.3d at 406 (internal quotations omitted); Social

Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7 (July 2, 1996).  However, it is "error to give [a treating source] opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole.  SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner*, 375 F.3d at 390 ("Treating physicians' opinions are only given such deference when supported by objective medical evidence.").

If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2) (establishing that the ALJ must "give good reasons" for weight given to treating source opinion)).  "Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion' – not an exhaustive factor-by-factor analysis."  *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)).  Ultimately, "[t]his procedural 'good reason' rule serves both to ensure adequacy of review and to permit the claimant to understand the disposition of his case."  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550-51 (6th Cir. 2010) (citing *Rogers,* 486 F.3d at 242).

a.   Dr. Nunez's Medical Source Statements

Dr. Nunez filled out a Diabetes Mellitus Medical Source Statement ("Diabetes Statement") and a Cardiac Medical Source Statement ("Cardiac Statement") on September 5, 2013.  (Tr. 331-38).  In the Diabetes Statement, Dr. Nunez indicated that Wejrandt's prognosis

was "fair" for diabetes mellitus (type II, uncontrolled), diabetes mellitus neuropathy, and venous stasis ulcer formation.  (Tr. 331).  She identified his symptoms as fatigue, difficulty walking, swelling, chronic skin infections, muscle weakness, leg cramping, and extremity pain and numbness.  (*Id.*).  Although she said no emotional factors contribute to the severity of his symptoms and functional limitations, she then indicated that depression affects his physical condition and that a "component of anxiety exists."  (Tr. 331, 334).

It is Dr. Nunez's opinion that Wejrandt can sit for thirty minutes at one time and for at least six hours in an eight-hour workday, and that he can stand for ten minutes at one time and stand or walk for two hours in an eight-hour workday.  (Tr. 332).  She opined that he needs to be able to walk every hour for ten minutes.  (*Id.*).  She noted that he requires the use of a cane and the ability to take one to two unscheduled breaks during the workday.  (Tr. 332-33).  She recorded that Wejrandt can lift less than ten pounds frequently (34% to 66% of an eight-hour workday), can lift ten to twenty pounds occasionally (6% to 33% of an eight-hour workday), should never lift fifty pounds, and that he can frequently stoop or bend.  (Tr. 333).  She opined that Wejrandt can use his hands (to grasp, turn, and twist objects) and arms (to reach in front of his body) for 40% of the day, his arms (to reach overhead) for 30% of the day, and his fingers (for fine manipulations) for 50% of the day.  (*Id.*).

In the Cardiac Statement, Dr. Nunez wrote that Wejrandt had arrhythmia as a result of atrial fibrillation, which she described as "consistent" and whose prognosis was "fair" – even though she noted that she was awaiting cardiac consultation results and testing had been limited due to health insurance issues.  (Tr. 335-36).  She opined that emotional factors contribute to the severity of his symptoms and functional limitations.  (Tr. 336).  She indicated that he can sit for four hours in an eight-hour workday, can stand or walk less than two hours in an eight-hour

workday, and needs to take unscheduled breaks daily to "sit quietly" for ten to fifteen minutes. (*Id.*). She further opined that he can frequently lift up to ten pounds, occasionally lift twenty pounds, never lift fifty pounds, and that he can occasionally stoop or bend. (Tr. 337).

In both the Diabetes and Cardiac Statements, she indicated that he can walk no city blocks without rest or severe pain, needs a sit/stand option, and has to elevate his legs above his heart because of edema.[2] (Tr. 332, 336-37). She also indicated that he can occasionally twist, crouch or squat, and climb stairs – but never climb ladders. (Tr. 333, 337). She estimated that Wejrandt would be off task 10% of the workday and absent two days per month. (Tr. 334, 338). Finally, when asked about additional limitations that would affect his ability to work, she listed herniated lower disc, sciatica, bursitis, and neuropathy. (*Id.*).

### b. The ALJ's Findings

The ALJ specifically considered Dr. Nunez's Diabetes and Cardiac Statements, evaluating them as follows:

> This opinion is given little weight because it is not a function-by function assessment of the claimant's capabilities in line with [Social Security Ruling] 96-8p, but rather is a conclusory statement and is unsupported by the record. Dr. Nunez's opinion is also unsupported by her objective clinical findings, rather, it appears to be a sympathetic opinion, based upon the claimant's subjective complaints. . . . I give greater weight to the opinions of the State agency consultant[] because unlike Dr. Nunez, [he] provided opinions supported by medically acceptable clinical findings consistent with the entirety of the longitudinal record.

(Tr. 18). In other words, the ALJ afforded little weight to Dr. Nunez's opinion and gave greater weight to the opinion of the State agency consultant, Dr. Wood.

---

[2] In the Diabetes Statement, Dr. Nunez indicated that during prolonged sitting at a sedentary job, Wejrandt needs to elevate his legs for 30% of the day. (Tr. 332). In the Cardiac Statement, when asked for what percentage of the workday his legs should be elevated at a sedentary job, she indicated that he should do no prolonged sitting but still has to elevate his legs. (Tr. 337).

Wejrandt argues that the ALJ was incorrect in finding that Dr. Nunez's opinion was not a function-by-function assessment.  (Doc. #15 at 10-11).  As to this point, the Commissioner concedes that the ALJ "does appear to be mistaken" but argues that "the rest of his rationale constitutes good reasons for giving the doctor's opinions little weight."  (Doc. #16 at 15).  The Court agrees.

The ALJ satisfied the "good reasons" requirement because he explained that Dr. Nunez's opinion was inconsistent with the evidence in the record.  (Doc. #16 at 8-10) (citing *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009); *Cutlip*, 25 F.3d at 287).  Contrary to Wejrandt's assertion that the ALJ "failed to set forth how Dr. Nunez's opinion is unsupported by the record" (Doc. #15 at 5) or that the ALJ relied only on "standard boilerplate" (Doc. #17 at 1), the ALJ identified specific inconsistencies between Dr. Nunez's statements and the record.  For example, the ALJ noted that Dr. Nunez opined that Wejrandt should do no prolonged sitting, needs to elevate his legs, should work less than six hours a day, and needs to be off task 10% of the workday.  (Tr. 18).  Yet "[t]reatment notes from Dr. Nunez show generally normal functioning with regular heart rate and rhythm, clear breath sounds and normal gait."  (*Id.*). Earlier in the decision, the ALJ referenced November 26, 2012 treatment notes by Dr. Nunez which reported that Wejrandt had clear breath sounds, regular heart rate and rhythm, non-pitting edema, a normal gait, and normal strength and tone in his extremities.  (Tr. 16) (citing Tr. 363-64).  The ALJ also observed that at the time Dr. Nunez issued her medical statements she "was awaiting a cardiac consultation."  (Tr. 18).

The ALJ's findings are supported by substantial evidence.  Starting with Dr. Nunez's own treatment records that span a little over one year, her review of Wejrandt's systems typically listed all or mostly all negative findings.  (Tr. 347-48, 350, 353, 355, 358, 361, 363, 368, 370).

More specifically, she found Wejrandt negative for calf pain, joint pain, muscle cramps, chest pain, shortness of breath, dizziness, numbness, and weakness, among other findings.  (*Id.*).  She noted that he generally had no fatigue.  (Tr. 347-48, 350, 353, 358-59, 361, 368, 370).  On numerous occasions she recorded that he had normal motor skills, reflexes in both knees, coordination, gait, and strength and tone in his bilateral upper and lower extremities.  (Tr. 349, 351, 360, 362, 364, 369, 371).  Although she once described his mood and affect as "depressed" (Tr. 364), much more often she found him alert, cooperative, oriented times three, and with normal and appropriate affect, speech, thought content and perception, and cognitive function. (Tr. 348-51, 353-54, 359, 361-64, 368-71).  The ALJ did not err in determining that these records are inconsistent with the significant limitations imposed in Dr. Nunez's Diabetes and Cardiac Statements.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997) (citing *Bogle v. Sullivan,* 998 F.2d 342, 347-48 (6th Cir. 1993) and *Cutlip*, 25 F.3d at 287) (inconsistency with the record is a "sufficiently valid reason not to accept the opinions of a treating medical doctor").

Additional records support the ALJ giving little weight to Dr. Nunez's opinion because they too contain findings that are inconsistent with the limitations imposed by Dr. Nunez.  There were two hospital visits in the span of six months in 2010:  one on June 2, 2010 (for palpitations and shortness of breath); another on December 8, 2010 (for shortness of breath with exertion and increased leg edema).  While Dr. Nunez found that Wejrandt had arrhythmia, abnormal serial EKGs, and possibly atrial fibrillation (Tr. 335-36, 338), hospital doctors found that his heart rhythm was regular, his bilateral radial and dorsalis pedis pulses were normal, his heart was positive for S1 and S2, he showed no signs of jugular vein distention, and he had no carotid bruit.  (Tr. 261, 278, 282, 285-86).  Charles Nino, M.D., in particular, recorded that his chest x-ray was negative and an initial EKG showed normal sinus rhythm.  (Tr. 278).  When he asked

Wejrandt about experiencing chest pain, pressure, or palpitations, he denied having any.  (Tr. 277).  The doctors also found that Wejrandt had no respiratory distress and no cough; that his lungs were clear and his breathing was clear, regular, and unlabored; and that his chest was symmetric.  (Tr. 261-63, 273, 278, 282, 286, 288, 291).

As to Dr. Nunez's assessment that Wejrandt had to elevate his feet when doing prolonged sitting at a sedentary job due to edema (Tr. 337), other doctors noted that he had no pedal edema in his extremities.  (Tr. 282, 291).  They also took a different view of his mental condition.  In contrast to Dr. Nunez, who said that Wejrandt had depression and a "component of anxiety" (Tr. 331, 334), other doctors opined that he was alert, awake, and oriented times three or four; had no focal deficits; and had appropriate affect and behavior, good appearance, and normal eye contact. (Tr. 273, 278, 282, 287-88, 285, 291).  They also noted that his systems (neurological, cardiovascular, respiratory, musculoskeletal) were largely within defined limits.  (Tr. 260-63, 284-85).  When Wejrandt was discharged from the hospital on December 11, 2010, he was in "stable condition" and was instructed to resume usual activity.  (Tr. 246, 251).

Further inconsistencies can be found in medical records from May 2011 through July 2011.  During this time frame, Wejrandt's heart had regular rate and rhythm, his lungs were clear to auscultation bilaterally, he had no cough, and he was not in respiratory distress.  (Tr. 241, 243, 301, 318).  He was alert and oriented, in no acute distress, and his affect and behavior were appropriate.  (*Id.*).  A review of systems was mostly within defined limits, and he complained of no pain symptoms.  (Tr. 239).  Melissa Bogos, P.A., saw Wejrandt between September 29, 2011 and June 13, 2012 mostly for medication refills.  Throughout these nine months, Bogos consistently found Wejrandt to have regular rate and rhythm in his heart; to have no cough and normal sinus rhythm; and to be alert and oriented times three and in no acute distress.  (Tr. 296-

300).  She noted that he had varying degrees of edema; from none to mild edema bilaterally. (*Id.*).  These records – which are at odds with Dr. Nunez's opinion – further support the ALJ's decision to give her opinion little weight.

The March 22, 2013 findings of consultative examiner Moises Alviar, M.D., also support the ALJ's decision to discount Dr. Nunez's opinion.  Dr. Alviar recorded that Wejrandt's HEENT (head, eye, ear, nose, throat) exam was normal, his heart was regular, and his lungs were clear to auscultation and percussion.  (Tr. 321).  Even though Dr. Alviar noted that Wejrandt had +1 edema in his lower extremities and that his peripheral pulses were hard to feel, he opined that Wejrandt's gait was normal; he could tandem, tiptoe, and heel walk; he did not need a walking aid; and he was able to get on and off the examination table "without difficulty."  (Tr. 321, 326). He noted that Wejrandt could sit and stand; bend, stoop, and squat up to 80%; and that apart from his lumbar spine and right hip, all other joints had normal range of motion.  (Tr. 322-24). Dr. Alviar also noted that Wejrandt's digital dexterity was intact, he had good handgrip bilaterally, and he could open a door and make a fist.  (Tr. 321, 324-25).  Wejrandt was alert, oriented, and cooperative; had no focal localizing signs; had intact cranial nerves; and had no motor or sensory deficits.  (Tr. 322).  Thus, Dr. Alviar's objective findings from his physical examination of Wejrandt support the ALJ's assessment of Dr. Nunez's opinion.  Indeed, Wejrandt agrees that Dr. Alviar's "exam findings were consistent with . . . the medical records as a whole."  (Doc. #15 at 8).

In his motion, Wejrandt highlights medical records from August 2013 for conditions such as diabetic neuropathy, ulcers, cellulitis, and edema that he claims support Dr. Nunez's opinion. (*Id.* at 6).  He also points out that in October 2013 and November 2013 he had a diminished dorsalis pedis pulse, which he contends is at odds with the ALJ's conclusion that his records

showed "no clinical findings." (*Id.* at 7). While he may have had a diminished pulse, there are still findings in Wejrandt's treatment notes from this time period that support the ALJ's determination. On October 30, 2013, the only complaint recorded in the review of systems was back pain; however, this complaint does not appear in the notes from his previous or subsequent appointments on October 23, 2013 and November 27, 2013. (Tr. 390, 394, 397). Objective findings from October 2013 and November 2013 indicate that his breath was clear; his heart had regular auscultation with no murmurs and S1 and S2 were within normal limits; and he had no edema. (Tr. 391, 395, 398). His motor skills, bilateral reflexes in his knees, coordination, gait, and strength and tone in his bilateral upper and lower extremities were also normal. (Tr. 391-92, 395, 398). Wejrandt was alert, cooperative, oriented times three, well nourished, well developed, well hydrated, not in acute distress, and not sickly. (Tr. 391, 394, 398). His mental status and cognitive function were normal. (Tr. 391, 395, 398).

Even though the ALJ is not required to discuss every piece of evidence in the administrative record, *see Kornecky*, 167 F. App'x at 508, the ALJ touched upon the majority of the medical opinions summarized above in his decision. (Tr. 15-18); *see infra* at 25-26. Wejrandt argues that he should be limited to sedentary work, but the burden is on him to show this, and he has not made this showing. *Preslar*, 14 F.3d at 1110. In his motion, Wejrandt lists evidence – both cited and not cited by the ALJ – that he argues is consistent with Dr. Nunez's opinion. (Doc. #15 at 5-6). But he fails to explain how this particular evidence supports Dr. Nunez's determinations as to his functional limitations, why they are inconsistent with the ALJ's RFC for light work, and why they would alter the ALJ's decision.

Wejrandt takes issue with the ALJ giving "great weight" to the opinion of State agency consultant Dr. Wood. (Doc. #15 at 3, 5, 10). "Social Security regulations recognize that

opinions from non-examining state agency consultants may be entitled to significant weight, because these individuals are 'highly qualified' and are 'experts in Social Security disability evaluation.'" *Rios v. Comm'r of Soc. Sec.*, No. 1:16-CV-171, 2016 WL 6310280, at *3 (W.D. Mich. Oct. 28, 2016) (internal quotations omitted).   At the same time, the ALJ "bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence" and is not required to adopt the findings of a state agency medical consultant.  *Thiele v. Berryhill*, No. 1:16CV00942, 2017 WL 1207977, at *16 (N.D. Ohio Mar. 10, 2017); 20 C.F.R. §§ 404.1545, 404.1546.  Thus, an ALJ is "free to consider the consultant's opinion and determine what weight, if any, it should be given." *Id.*  Given that this is precisely what the ALJ did in this case, his consideration of Dr. Wood's opinion in formulating the RFC was valid.

In addition to Wejrandt's medical records, the ALJ properly considered Wejrandt's testimony.  The ALJ looked at Wejrandt's initial disability report and pointed out that Wejrandt did not allege additional complaints or worsening of symptoms on appeal.  (Tr. 15).  The ALJ also noted that in the insurance claims adjuster job Wejrandt was performing at the time he was laid off (the alleged onset date), he at least occasionally performed work which significantly exceeded the physical limitations imposed by Dr. Nunez.  (Tr. 15, 17).  From this the ALJ appropriately concluded that "it is reasonable to assume that [Wejrandt] can perform the physical requirements of light work with additional postural restrictions."  (*Id.*).  Finally, the ALJ noted that although Wejrandt does not drive, he performs all of his personal care, does household chores such as vacuuming and shopping, and rides two to three miles on a bicycle.  (*Id.*).

In sum, substantial evidence supports the ALJ's evaluation of Dr. Nunez's opinion.  The ALJ provided "good reasons" that make it clear he gave limited weight to Dr. Nunez's opinion because he found it was inconsistent with the record evidence, including the medical evidence

and Wejrandt's testimony.  *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at

*5); *Francis*, 414 F. App'x at 806 ([S]ubstantial evidence supported ALJ's decision to reject

treating doctor's opinion where the ALJ cited "specific conflicts between [the] opinion and

substantial medical, lifestyle, and opinion evidence," and so "we look no further into [the

decision's] merits.").

### 2.     *The ALJ did not Present an Improper and Incomplete RFC to the VE*

At Step Five of his analysis, the ALJ concluded – based on the VE's testimony – that

Wejrandt could perform the following light jobs that exist in significant numbers in the national

economy:  cashier (2,600 jobs in Michigan, 136,000 jobs in the national economy); assembler

(4,600 jobs in Michigan, 188,000 jobs in the national economy); and packer (1,700 jobs in

Michigan, 131,000 jobs in the national economy).  (Tr. 19-20).  Wejrandt argues that the ALJ

erred by giving the VE an RFC that was improper, because it was limited to light work, and

incomplete, because it failed to include many impairments "without justification."  (Doc. #15 at

17).  The Court disagrees.

If the ALJ determines that a claimant's impairments prevent him from doing his past

work, the Commissioner has the burden at Step Five of "proving that there is work available in

the economy that the claimant can perform."  *Vandenboss v. Comm'r of Soc. Sec.*, No. 14-12283-

DT, 2015 WL 3823558, at *3 (E.D. Mich. June 18, 2015) (quoting *Her v. Comm'r of Soc. Sec.*,

203 F.3d 388, 389-90 (6th Cir. 1999)); *Preslar*, 14 F.3d at 1110.  "To meet this burden, the

Commissioner must make a finding 'supported by substantial evidence that [the claimant] has

the vocational qualifications to perform specific jobs.'"  *Vandenboss*, 2015 WL 3823558, at *3

(quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)).  "This

'substantial evidence' may be in the form of [VE] testimony in response to a hypothetical

question, 'but only 'if the question accurately portrays [the claimant's] individual . . . impairments.''" *Id.* (internal citations omitted); *Varley*, 820 F.2d at 779; *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001) (establishing that where the ALJ's questioning is accurate, a VE's "testimony concerning the availability of suitable work may constitute substantial evidence"). In other words, "[t]he ALJ is not required to question a [VE] on this issue," but "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs" is needed for the Commissioner to meet this burden. *Johnson v. Comm'r of Soc. Sec.*, No. 1:15-cv-449, 2016 WL 2342892, at *3 (W.D. Mich. Apr. 15, 2016) (quoting *O'Banner v. Sec'y of Health & Human Servs.*, 587 F.2d 321, 323 (6th Cir. 1978)). Because this standard "requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy[,] . . . ALJs routinely question [VEs] in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding." *Id.* (citing *Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984)). An ALJ is not required to list a claimant's medical conditions in his questioning, but rather, must present an assessment of what the claimant "can and cannot do." *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004).

Wejrandt takes issue with the light work RFC presented to the VE because he believes the ALJ "did not have sufficient justification" for rejecting Dr. Nunez's opinion, which he contends would have limited him to sedentary work. (Doc. #15 at 17, 19). As explained above, the ALJ's assessment of Dr. Nunez's opinion was appropriate, so this argument fails.

Wejrandt also argues that he should have been limited to sedentary work because the jobs listed by the VE that would allow him to sit down and rest four times per hour are "properly listed as sedentary as opposed to light." (*Id.* at 17-18). Wejrandt fails to support this assertion

with any relevant case law or social security ruling or regulation.  In fact, needing to sit down and rest four times per hour does not fall under the definition of light or sedentary work under 20 C.F.R. § 404.1567.  And, as the Commissioner indicates, work is designated as light "when it requires a good deal of walking or standing, *or* when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  (Doc. #16 at 26); 20 C.F.R. § 404.1567(b) (emphasis added).  Thus, Wejrandt's reference to a single case in the Eastern District of New York to support his contention that light work "requires a great deal of walking and standing" is unavailing.  In addition, Wejrandt's assertion that "[e]very medical source statement and the sworn testimony at the hearing indicated a significant restriction in walking and standing" is factually inaccurate.  (Doc. #15 at 19).  As noted above, multiple medical providers noted that Wejrandt had little or no difficulty standing and walking.  (*See, e.g.*, Tr. 322-24, 326, 349, 351, 360, 362, 364, 369, 371, 391-92, 395, 398).

Wejrandt argues that the RFC was "incomplete" because it did not include a limitation for raising his legs above waist level when seated for prolonged periods of time.  (Doc. #15 at 17, 19).  But an ALJ's hypothetical questions "need only include those limitations which he accepts as credible."  *Delp v. Comm'r of Soc. Sec.*, No. 1:13-cv-840, 2014 WL 4748696, at *7 (W.D. Mich. Sept. 24, 2014) (citing *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990)).  The ALJ is thus under no obligation "to incorporate unsubstantiated complaints into his hypotheticals."  *Id.* (citing *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994)); *Muma v. Comm'r of Soc. Sec.*, No. 15-12786, 2016 WL 6093413, at *13 (E.D. Mich. Oct. 19, 2016) (holding that the ALJ "was free to omit [the claimant's] unsubstantiated limitations from his questions to the VE" (citing *Accord Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010))).  Here, the requirement that Wejrandt elevate his

legs above his waist appeared in Wejrandt's testimony, which the ALJ considered (Tr. 15), and in Dr. Nunez's opinion, which the ALJ properly gave only limited weight.  (Tr. 18).   On December 9, 2010, Wejrandt reported sleeping in a recliner for the prior six months, but indicated that he did so "due to heartburn symptoms."  (Tr. 277).  Accordingly, the ALJ was not required to include this limitation in the hypothetical questions he presented to the VE, and he therefore committed no error with respect to this issue.  Moreover, Wejrandt points to no medical evidence that supports the need for him to elevate his feet that the ALJ should have considered. Thus, this argument has no merit.

Wejrandt also argues that the RFC is incomplete because it does not specify the amount of time that he would need to be sitting or standing, other than that he "must be permitted to alternate between sitting and standing up to four times per hour."  (Doc. #15 at 17) (quoting Tr. 14).  Wejrandt argues that this runs contrary to the guidelines of SSR 96-9p, 1996 WL 374185 (July 2, 1996).   (*Id.*).   But as the Commissioner points out, this ruling applies to RFC assessments "for less than a full range of sedentary work."  (Doc. #16 at 26) (citing SSR 96-9p, 1996 WL 374185, at *1 (July 2, 1996)).  The requirements of SSR 96-9p therefore do not apply to Wejrandt's RFC, which is for light work with some additional limitations.

Because the ALJ's questioning was not improper or incomplete, the ALJ's reliance on the VE's finding that Wejrandt could perform the "specific jobs" of a cashier, assembler, and packer (Tr. 20) was appropriate and is supported by substantial evidence.  *Johnson*, 2016 WL 2342892, at *3 (quoting *O'Banner*, 587 F.2d at 323).  Accordingly, the ALJ's decision is supported by substantial evidence.

### 3.   Substantial Evidence Supports the ALJ's Credibility Determination

The ALJ found that Wejrandt's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible."  (Tr. 17).  Wejrandt argues that this

determination is not backed by "sufficient reasoning" because the "only" reasoning provided was based on an evaluation of the medical and opinion evidence.  (Doc. #15 at 11).  Elsewhere in his motion Wejrandt claims the "only" evidence the ALJ "alluded to" was that he "tried to do what he could at home and did some minor chores at his own pace."  (*Id.* at 12).  Neither argument has merit.

The Sixth Circuit has held that determinations of credibility rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'"  *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare,* 577 F.2d 383, 387 (6th Cir. 1978)).  Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith*, 307 F.3d at 379.  The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record.  *See Walters*, 127 F.3d at 531.  Rather, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record."  SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996)[3]; *see also* 20 C.F.R. § 416.929.  "An ALJ may discount a claimant's credibility where the ALJ 'finds contradictions among the medical records, claimant's testimony, and other evidence.'"  *Cole v. Comm'r of Soc. Sec.*, No. 1:15-cv-833, 2016 WL 5334593, at *4 (W.D. Mich. Sept. 23, 2016) (citing *Walters*, 127 F.3d at

---

[3] 96-7p, 1996 WL 374186 (July 2, 1996), was superseded by SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).  Because SSR 96-7p was in effect when the ALJ issued his decision on July 7, 2014, the Court will reference the earlier ruling.

531).  In making an adjudication, a "single, conclusory statement" asserting consideration of the individual's symptoms, stating that the allegations are (or are not) credible, or reciting the factors in the regulations is insufficient.  SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).  Instead, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Id.*

Here, the ALJ noted contradictions between the medical records, Wejrandt's testimony, and other evidence.  Wejrandt argues that the ALJ "failed to specifically identify what testimony was not credible and what evidence undermined his complaints,"[4] but this assertion mischaracterizes the ALJ's decision.  (Doc. #15 at 12).  The ALJ cited specific medical records to support his credibility determination.  The ALJ reviewed records from May 2010, where Wejrandt's conditions were stable and his heartbeats were irregular, and from December 2010, when he was hospitalized for increased swelling in both lower extremities but his heart rate was normal and his lungs were clear.  (Tr. 15).  The ALJ also reviewed records from appointments for medication refills in September 2011, November 2011, and March 2012.  (Tr. 15-16).  Wejrandt had clear lungs, no cough, regular heart rate and rhythm, but also irregular breath sounds, trace edema, and dull sensations and "burning numbness" in his lower extremities.  (*Id.*).  The ALJ mentioned Dr. Nunez's November 2012 treatment notes indicating that Wejrandt saw her to follow up on his diabetes, and that he had clear breath sounds and regular heart rate and rhythm, non-pitting edema, and normal gait with normal strength and tone in his extremities.

---

[4] Wejrandt relies on a Ninth Circuit case, *Vertigan v. Comm'r of Soc. Sec.*, 260 F.3d 1044 (9th Cir. 2001), to support this argument.  (Doc. #15 at 12-14).  But that case is not binding law in this circuit, and, in any event, as explained below, the ALJ's decision makes clear the basis for his credibility determination.

(Tr. 15).  He noted that Wejrandt underwent a consultative examination in March 2013, where he had a regular heart rate and clear lungs, 1+ edema in his lower extremities, normal gait, no motor or sensory deficits, and a decreased range of motion in his lumbar spine.  (*Id.*).  The ALJ took into account that an x-ray of Wejrandt's lumbar spine showed moderate spondylolisthesis and degenerative osteoarthritic changes.  (*Id.*).

The ALJ also noted that Wejrandt went back to Dr. Nunez in September 2013 for lower extremity edema in his left leg; his heart rhythm was irregular and he had a diabetic ulcer formation on his left shin, but he reported that he was feeling well, his breath sounds were clear, and he had normal strength in all extremities.  (*Id.*).  The ALJ considered treatment notes from October 2013, when Wejrandt saw a doctor due to his diabetes and low back pain, but he had clear breath sounds, regular rate and rhythm, no edema bilaterally, normal gait, normal strength and tone in all extremities, and no abnormalities in his back.  (*Id.*).  The ALJ pointed out that Wejrandt's most recent physical examination was in November 2013, when he was treated for a "small superficial wound" on his leg; however, his breath sounds were clear, his heart rate and rhythm were regular, and his gait was normal.  (Tr. 17).  In addition, the ALJ thoroughly considered the opinions of Dr. Wood and Dr. Nunez, including Dr. Nunez's Diabetes and Cardiac Statements, which are discussed above.  (Tr. 17-18).

Wejrandt argues that the ALJ's credibility assessment was improperly based on his consideration of Wejrandt's work history.  (Doc. #15 at 11-12).  It is permissible for an ALJ to consider a claimant's work history in assessing his credibility.  *Perrault v. Comm'r of Soc. Sec.*, No. 1:14-CV-942, 2015 WL 5592931, at *6 (W.D. Mich. Sept. 22, 2015); 20 C.F.R. § 404.1529(c)(3) ("We will consider all of the evidence presented, including information about your prior work record . . . .").  As to this issue, the ALJ specifically identified portions of

Wejrandt's testimony where he "described his past work differently." (Tr. 17). The ALJ noted that Wejrandt testified to having to lift or carry up to 100 pounds and needing to climb and crawl; in contrast, Wejrandt wrote in his Work History Report that he had to lift or carry fifty pounds and did not mention the need to climb and crawl. (*Id.*). The ALJ evenly evaluated this information, noting that while Wejrandt testified that he had to climb over or crawl under vehicles to inspect them, he did not testify as to the frequency of these activities, so "they may have been seldom." (*Id.*). The ALJ appropriately concluded that even seldom engagement in those activities made it "reasonable to assume that [Wejrandt] can perform the physical requirements of light work with additional postural restrictions." (*Id.*). Thus, the ALJ explained his reasoning in making a credibility assessment based on Wejrandt's work history, which was entirely permissible.

Wejrandt also argues that the extent of his treatment and his daily activities are not proper grounds to discredit his credibility.[5] (Doc. #15 at 11-12, 14). But it was appropriate for the ALJ to consider his treatment history, and his findings in that regard are supported by substantial evidence. *See* SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996) (requiring the ALJ's credibility assessment to consider, in addition to the objective medical evidence, the claimant's treatment history, including treatment other than medication and its type, dosage, effectiveness, and side effects); 20 C.F.R. § 404.1529(c)(3). The ALJ concluded that Wejrandt's treatment was routine and conservative in nature and that his impairments appeared to be controlled with medication. (Tr. 17). A review of the record confirms that Wejrandt's treatment was apparently effective. Multiple records note that cardiovascular examinations were normal, including that his heart rate and rhythm were regular. (Tr. 245, 261, 275, 278, 285-86, 293, 296-97, 318-19, 321, 351, 353,

---

[5] Wejrandt based this argument on a Seventh Circuit case called *Beardsley v. Colvin*, 758 F.3d 834 (7th Cir. 2014), which is not binding upon this Court. (Doc. #15 at 14).

359, 362, 364, 369, 371, 391, 395, 398).  His lungs and breathing were clear (Tr. 237, 245, 275,

282, 291, 296-98, 300, 318-19, 321, 348, 391, 395, 398), and his respirations and respiratory

pattern were regular.  (Tr. 243, 261-63, 273, 275, 278, 286, 293).  Indeed, on December 10, 2010

and December 16, 2010, doctors opined that Wejrandt's heart rate was controlled with a beta

blocker, his rhythm was controlled with Multaq, and his hypertension was controlled.  (Tr. 276,

279).  Numerous physicians noted that he was oriented (Tr. 233, 237, 243, 245, 273, 275, 285,

287, 291, 296-301, 318-19, 322, 348, 350, 353, 359, 361, 363, 368, 370, 391, 394) and in no

acute distress.  (Tr. 233, 245, 278, 282, 296-301, 313-14, 318-19, 348, 350, 353, 359, 361, 363,

368, 370, 391, 394).  And physicians, including Dr. Nunez and Dr. Alviar, found that he had

normal gait and coordination, normal reflexes, and normal strength and tone in his bilateral

extremities despite having limited range of motion in his lumbar spine.  (Tr. 321, 326, 349, 351,

360, 362, 364, 369, 371, 392, 395).  Dr. Alviar opined that he did not need a walking aid.  (Tr.

326).  Thus, the ALJ's conclusion about the effectiveness of Wejrandt's treatment is supported

by substantial evidence.

Wejrandt also argues that the ALJ erred because he did not explain what treatment would

be expected based on his conditions.  (Doc. #15 at 14).  But the ALJ is not required to do this

under SSR 96-7p, 1996 WL 374186 (July 2, 1996), nor under 20 C.F.R. § 416.929.  Moreover,

Wejrandt argues that elevating his feet above waist level when sitting is part of his treatment,

which the ALJ "completely dismissed and failed to include in his RFC to the [VE]."  (Doc. #15

at 14).  As noted above, *see supra* at 22-23, Wejrandt has not supported this assertion that

elevating his legs was part of his treatment in any way, so the ALJ did not err in not considering

it in his assessment of Wejrandt's treatment history, nor in failing to include such a limitation in

the RFC presented to the VE.

As to Wejrandt's argument about the ALJ's failure to determine why he did not pursue "more aggressive" treatment[6] (Doc. #15 at 14-15), the ALJ "may consider the frequency and type of treatment a claimant seeks in determining the credibility of his alleged symptoms" because generally, when a claimant alleges pain so severe that it is disabling, it is reasonable to expect that the claimant will seek examination or treatment. *Harris v. Comm'r of Soc. Sec.*, No. 14-14508, 2015 WL 12670524, at *11 (E.D. Mich. Oct. 7, 2015) (internal citations omitted); *see Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004); SSR 96-7p, 1996 WL 374186, at *7.   But the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations *that the individual may provide, or other information in the case record*, that may explain infrequent or irregular medical visits or failure to seek medical treatment."   SSR 96-7p, 1996 WL 374186, at *7 (emphasis added).   The applicable regulations provide that the ALJ may need to recontact the claimant or question him during the hearing, but this is not a requirement.   *Id.*   "While the ALJ [is] required to consider any explanations for plaintiff's failure to seek out medical treatment, [where] plaintiff has offered none for the ALJ to consider, [t]here is no basis to reverse the ALJ's decision."   *Perrault*, 2015 WL 5592931, at *6-7.   Here, Wejrandt has provided no explanation to the ALJ regarding his failure to seek more aggressive treatment.   Accordingly, this claim of error does not provide grounds for remand.

In addition, the ALJ properly considered Wejrandt's activities of daily living as they bear on his credibility.   *See* SSR 96-7p, 1996 WL 374186, at *3 (requiring the ALJ to consider the claimant's daily activities in assessing the credibility of his statements); 20 C.F.R. §

---

[6] In arguing that the ALJ was required to look into why he received "conservative" treatment, Wejrandt cites to *Beardsley v. Colvin*, 758 F.3d 834 (7th Cir. 2014), which is not binding upon courts within this circuit.   (Doc. #15 at 14-15).

404.1529(c)(3)(i); *Cole*, 2016 WL 5334593, at *6 ("[T]he ALJ could consider a claimant's household and social activities in evaluating her assertions of pain or ailments." (internal citation omitted)).  The ALJ noted that Wejrandt doesn't drive, but he handles all of his personal care independently, vacuums and shops, and rides two or three miles on a bicycle.  (Tr. 15, 17).  Wejrandt argues that these activities are in line with a less than sedentary RFC.  (Doc. #15 at 13-14).  But here the ALJ assessed these activities for a different purpose:  to evaluate Wejrandt's credibility.  SSR 96-7p, 1996 WL 374186, at *3; 20 C.F.R. § 416.929(c)(3)(i).

Wejrandt argues that the ALJ failed to explain how his activities of daily living are "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations."  (Doc. #15 at 13-14) (citing Tr. 17).  According to Wejrandt, the ALJ did not provide "clear and convincing reasons for dismissing [his] testimony" that he could not sit, stand, or walk for extended periods of time and had to elevate his legs.  (*Id.* at 14).  Wejrandt points out that his testimony is consistent with Dr. Nunez's Diabetes and Cardiac Statements.  (Doc. #15 at 14).  But the ALJ chose to give these statements little weight, which as explained above, he was entitled to do based on his finding that they were inconsistent with the record.  Moreover, the Sixth Circuit has held that a claimant who can manage his personal hygiene, perform daily house chores, and participate in social activities weighs against a finding of disability.[7]  *Cole*, 2016 WL 5334593, at *6 (finding that activities such as daily house chores (cleaning, cooking making beds, fixing things "at [the claimant's] own time") "are not indicative of an invalid, incapable of performing work related activities" (citing *Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 846

---

[7] Wejrandt again cites to the Ninth Circuit's decision in *Vertigan*, 260 F.3d 1044, in arguing that he had very limited daily activities that did not come close to consuming a "substantial part" of his day.  (Doc. #15 at 13).  But finding that his activities consume a "substantial part" of his day is not a requirement in the Sixth Circuit.  Again, the issue here is simply the consistency of whether the particular piece of evidence in issue – such as Wejrandt's testimony that he can ride a bicycle for two or three miles – is inconsistent with his professed limitations.

(6th Cir. 2005); *Warner*, 375 F.3d at 392; *Bogle*, 998 F.2d at 348; *Gist v. Sec'y of Health & Human Servs.*, 736 F.2d 352, 358 (6th Cir. 1984)).

In addition to the activities that the ALJ mentioned in his decision, Wejrandt testified that he prepares his own meals daily, makes phone calls, listens to the radio, reads, watches television and movies, uses a computer, walks, and exercises with hand weights. (Tr. 42, 50, 148-49). He talks to relatives and plays numerous card games – poker, rummy, euchre – weekly. (Tr. 42, 151). It was appropriate for the ALJ to weigh Wejrandt's subjective statements about having difficulty sitting, standing and walking, and needing to elevate his legs, against objective medical findings and Wejrandt's own testimony regarding his activities of daily living in evaluating his credibility. SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996); *Cole*, 2016 WL 5334593, at *6.

In sum, in assessing Wejrandt's credibility and the effects of his impairments, the ALJ fairly and properly considered the record evidence, including Wejrandt's medical records, work history, treatment history, and activities of daily living. No reason exists to disturb the ALJ's credibility determination because he observed Wejrandt firsthand and his evaluation of the severity of Wejrandt's symptoms and capabilities is supported by substantial evidence in the record. *See Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1998) (finding that the Secretary "did not err in concluding that [the claimant's] complaints of pain were not credible" because the evidence "indicated that [the claimant] was not inconvenienced by his pain and was able to perform a variety of activities").

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III. CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion

for Summary Judgment [16] be GRANTED, Wejrandt's Motion for Summary Judgment [15] be

DENIED, and the ALJ's decision be AFFIRMED.


Dated: July 11, 2017                         s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and

Order, any party may serve and file specific written objections to the proposed findings and

recommendations and the order set forth above.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any

further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431

F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will

be preserved for the Court's appellate review; raising some objections but not others will not

preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829

F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th

Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich.

LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with

a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be

concise, and should address specifically, and in the same order raised, each issue presented in the

objections.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 11, 2017.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager